**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| GREGORY W. SMITH | ) | CASE NO. 11-34263 |
| | ) | CHAPTER 7 |
| Debtor | ) | |
| _____ | ) | |

**MEMORANDUM**

This case came before the Court on March 6, 2012, for an evidentiary hearing on the Motion to Dismiss filed by the Creditor, Republic Bank & Trust Company (hereinafter the "Bank"). The Debtor opposed the motion. Both a representative of the Bank and the Debtor appeared and were represented by counsel. The Court, having considered the testimony and evidence presented at the hearing, concludes the Bank's Motion to Dismiss must be denied. The Court enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Bank. P. 7052.

**FINDINGS OF FACT**

On August 24, 2007, the Debtor executed a Note and Mortgage wherein he borrowed $91,250.00 from the Bank in order to purchase a condominium located at 9005 Falcon Crest Court, Unit 219, Louisville, Kentucky. According to the Debtor, shortly after the purchase of the property, he discovered several flaws with the property, including noisy neighbors, poor maintenance, and a significant crime risk.

Due to these conditions, the Debtor listed the property for sale. The Debtor listed the property for sale for a total of eight months, but was unable to sell the property. The Debtor testified that he had only four viewings during this entire period of time.

About a year after the Debtor stopped listing the property for sale, he contacted the Bank on July 28, 2010, and again on August 5, 2010, inquiring about either a short sale for the property or

possibly a deed in lieu for the property. The Bank informed the Debtor that, considering his perfect payment history, apparent lack of financial hardship, and failure to make sufficient efforts to sell the property, it had no interest in either of those options.

The Debtor's monthly payment on this property totaled $722.62, which consisted of the following: $624.96 for principal and interest and $97.66 for escrow. The Debtor made all payments on the debt in a timely fashion until September 1, 2010. After that date, the Debtor did not make any payments, full or partial, on the debt. The Debtor testified that he had no trouble making the payments, but that he simply decided he did not want the property anymore and stopped making payments. Because he was no longer making mortgage payments, the Debtor was able to accumulate extra funds in his savings account. As of the bankruptcy petition date, the Debtor possessed over $11,000.00 in his savings account. During this time, the Debtor also increased his life insurance policy from a $50,000.00 policy to a $100,000.00 policy. The Debtor also used this insurance coverage as a savings vehicle in which he was able to save over $1,500.00 as of the bankruptcy petition date.

In January 2011, the Bank began foreclosure proceedings, and on April 14, 2011, the Bank received a Judgment and Order of Sale for the property. On August 16, 2011, the property sold at a foreclosure sale for $52,000.00, with the Bank being the purchaser of the property. With this sales price, the Bank was left with a deficiency balance of $45,853.47, as of August 16, 2011. Over $2,000.00 of this deficiency balance resulted from court costs associated with the foreclosure action and the commissioner's fees associated with the foreclosure sale.

The Debtor commenced this Chapter 7 bankruptcy case on August 31, 2011, shortly after the conclusion of the foreclosure sale. The Debtor testified he waited until after the foreclosure sale to file for Chapter 7 because he wanted the exact amount owed to the Bank to list in his bankruptcy

schedules. Debtor's Schedule I reflected a combined monthly income of $2,232.21, while his Schedule J reflected monthly expenses of $2,180.73, leaving extra disposable income of $51.48. The Debtor's claimed monthly expenses included the following itemized expenditures:

| | |
|---|---|
| Rent or Mortgage Payment | $600.00 |
| Laundry and Dry Cleaning | $60.00 |
| Transportation | $350.00 |
| Charitable Contribution | $25.00 |
| Personal Care Products and Expenses | $75.00 |
| Car Maintenance | $75.00 |
| Storage Unit | $90.00 |

On January 20, 2012, the Bank filed the Motion to Dismiss currently before the Court. In the motion, the Bank sought dismissal under 11 U.S.C. § 707, alleging that granting relief would be an abuse of the provisions of Chapter 7. The Bank alleged that the sole purpose of the Debtor's filing was to discharge the deficiency balance remaining after the sale of the real property. The Bank further alleged that the Debtor possessed sufficient income to fund a Chapter 13 plan and pay approximately 25% of his unsecured debt over a period of five (5) years. The Bank took issue with many of the Debtor's expenses, alleging they were excessive or unsupported. Specifically, the Bank alleged the transportation expense, the car maintenance expense, the personal care expense, the storage unit expense, the laundry / dry cleaning expense, and the charitable contribution expense were all excessive. Finally, the Bank alleged that the Debtor receives income tax refunds every year which he could use to fund a plan. In the 2009 tax year, the Debtor received a federal tax refund of $1,621.00 and a $322.00 state refund. In tax year 2010, the Debtor received a $1,564.00 federal tax refund and a state refund of $227.00

The Debtor filed an Objection to Motion to Dismiss denying that this case would be an abuse of the provisions of Chapter 7. The Debtor also disputed the allegations that his expenses are excessive. While not plead in his response, at the evidentiary hearing, the Debtor requested damages

for the filing of the motion by the Bank.

## CONCLUSIONS OF LAW

This matter is before the Court on the Bank's Motion to Dismiss. Matters concerning the dismissal of a case, which affects both the ability of a debtor to receive a discharge and directly affects the creditor-debtor relationship, are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(J) and (O). As a core proceeding, this Court possesses the jurisdictional authority to enter final orders in this matter. 28 U.S.C. § 157(b)(1).

The Bank is seeking dismissal pursuant to the provision of 11 U.S.C. § 707(b)(1) and § 707(b)(3).[1] These provisions authorize a court to dismiss a debtor's bankruptcy case when the particular circumstances of a case demonstrate abuse. In relevant part, these provisions provide:

> (b)(1) After notice and a hearing, the court ... may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts ... if it finds that the granting of relief would be an abuse of the provisions of this chapter.
>
> (3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider—
>
> (A) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of the circumstances ... of the debtor's financial situation demonstrates abuse.

---

[1] Section 707(b)(3) is but one of two subordinate paragraphs a court may utilize when determining whether a debtor's case should be dismissed for abuse under § 707(b)(1). The other, contained in § 707(b)(2), is known as the "means test" and creates a presumption of abuse if, under its formulaic approach, a debtor is determined to have the ability to repay his or her creditors. Normally, the United States Trustee's ("UST") Office would bring a motion to dismiss under § 707(b)(2) if the circumstances warranted such a motion. Notwithstanding the fact that the UST Office in this District is quite active in this area, the UST did not bring a dismissal motion in this case.

11 U.S.C. § 707(b). Generally speaking, § 707(b)(1) sets forth provides for dismissal of case when abuse is found to exist, and § 707(b)(3) then provides a methodology to determine whether abuse exists under § 707(b)(1).

This Court will first consider whether "the debtor filed the petition in bad faith." The Sixth Circuit in Industrial Ins. Servs., Inc. v. Zick (In re Zick), 931 F.2d 1124 (6th Cir.1991) held:

> Dismissal based on lack of good faith must be undertaken on an ad hoc basis. It should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence.

Zick at 1128 (internal citations omitted).

Looking at the case currently before the Court, the Court would first note that this is not an "egregious case" and that the Debtor has not "concealed or misrepresented assets and/or sources of income," and does not possess "excessive expenditures" or live a "lavish lifestyle." Moreover, there is no indication that the Debtor's conduct comes close to a finding of "fraud, misconduct, or gross negligence." Thus, under the standard set forth in Zick, this case does not meet the criteria for bad faith under § 707(b).

Additionally, in a case this judge participated in while serving as the Chapter 7 Trustee, the bankruptcy court in In re Spagnolia, 199 B.R. 362 (Bankr. W.D. Ky. 1995) set forth a number of factors which support a finding of bad faith. These include:

> 1. The debtor reduced his creditors to a single creditor in the months prior to filing the petition.
>
> 2. The debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle.
>
> 3. The debtor filed the case in response to a judgment pending litigation, or collection action; there is an intent to avoid a large single debt.

> 4. The debtor made no effort to repay his debts.
>
> 5. The unfairness of the use of Chapter 7.
>
> 6. The debtor has sufficient resources to pay his debts.
>
> 7. The debtor is paying debts to insiders.
>
> 8. The schedules inflate expenses to disguise financial well-being.
>
> 9. The debtor transferred assets.
>
> 10. The debtor is over-utilizing the protection of the Code to the unconscionable detriment of creditors.
>
> 11. The debtor employed a deliberate and persistent pattern of evading a single major creditor.
>
> 12. The debtor failed to make candid and full disclosure.
>
> 13. The debts are modest in relation to assets and income.
>
> 14. There are multiple bankruptcy filings or other procedural "gymnastics."

Spagnolia at 364.

Applying the Spagnolia factors to this case produces mixed results. This Debtor did not reduce his creditors to a single creditor in the months prior to the filing of this bankruptcy petition. While the Debtor possessed very few creditors, this resulted from a frugal lifestyle more than from an effort to actively reduce his creditors in number. Along this same line, the Debtor did not need to make lifestyle adjustments to curb a lavish lifestyle. As just stated, the Debtor lived a very frugal lifestyle, and did not live above his means.

While it is true the Debtor appears to have filed this case in order to avoid a single large debt, the evidence is also clear that the Debtor made regular monthly payments for over three years on the debt owed to the Bank. There are no indications of payments to any insiders, or other preferential or fraudulent transfers of property to avoid repayment to creditors. Additionally, this

is the Debtor's only bankruptcy case filed within the past eight years. In fact, the Debtor testified that he had never filed for bankruptcy before the filing of the current case. Thus, there are no "multiple bankruptcy filings or other procedural gymnastics" present in this case.

This takes the Court to the issue of the Debtor's expenses. As just stated, one of the factors of bad faith is whether the schedules inflate expenses to disguise financial well-being. The Bank took issue with many of the expenses claimed by the Debtor. This Court must disagree with the Bank's conclusions. In this Court's opinion, none of the complained of expenses are unreasonable or otherwise excessive. Indeed, compared to expenses listed in many cases before this Court, the claimed expenses in this case are very reasonable. The Court cannot find that the Debtor either inflated his expenses or that the expenses themselves are unreasonable.

The Bank was able to get the Debtor to admit that some of the information in his schedules was inaccurate. Both the amount in savings account and life insurance value were under valued. The Debtor offered testimony, however, that at least one of the expenses listed was understated. The Debtor scheduled a transportation expense of $350.00, but testified he spent about $100.00 a week on gasoline, which would result in a $400.00 monthly transportation expense. Looking at the totality of the information contained in the schedules, the Court cannot find that the Debtor failed to make candid or full disclosures.

This takes the Court to the factors which look to the "unfairness of the use of Chapter 7" and whether the debtor is "over-utilizing the protection of the Code to the unconscionable detriment of creditors." A primary point argued by the Bank is that the Debtor's actions are a "deliberate misuse of bankruptcy." Because the Debtor had the ability to keep making payments on this property, the Bank argues it would be unfair or unconscionable to let the Debtor simply walk away and discharge the deficiency balance in Chapter 7. The Court does not agree. The Court is aware of numerous

instances where the primary purpose of a bankruptcy is to discharge a large deficiency claim. Indeed, in light of the housing market crash of the last few years, this reason is somewhat common. What makes this case different is that the Debtor has not suffered a calamitous event to necessitate the filing of this bankruptcy case. The Debtor did not lose his job, did not suffer from a medical condition, or suffer some other misfortune. Instead, this Debtor simply chose to abandon the property to foreclosure. The Court cannot find and the Bank has not cited to any statutory authority tying a debtor's Chapter 7 eligibility to some calamitous event. The Code does not require such a connection, and this Court refuses to impose such a connection.

One final point the Court will note is that the Debtor contacted the Bank twice in order to work out a satisfactory arrangement. Although the Bank was certainly under no obligation to accept the Debtor's proposals, the Bank would have saved over $2,000.00 in costs if it had. The Debtor's willingness to work with the Bank to formulate a solution that would have saved the Bank significant collection costs is yet another indication that the Debtor has not acted in bad faith.

In light of the above-mentioned factors, the Court does not find that this case was filed in bad faith. While it is clear the Debtor was attempting to avoid a single large deficiency claim, the other factors all weigh in favor of a finding of the absence of bad faith.

This takes the Court to the next consideration under § 707(b)(3), whether "the totality of the circumstances ... of the debtor's financial situation demonstrates abuse." One of the seminal cases in the Sixth Circuit concerning whether the totality of the debtor's circumstances indicate abuse is the decision in <u>In re Behlke</u>, 358 F.3d 429 (6th Cir. 2004). In <u>In re Behlke</u>, the Court explained that abuse could be predicated upon want of need. <u>Id.</u> According to the Court, want of need is ascertained by considering whether the debtor is "'needy' in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets." <u>Id.</u> at 435.

In considering the totality of a debtor's financial circumstances to determine want of need, the prime consideration will often center on the debtor's ability to repay his debts. In re Krohn, 886 F.2d 123, 126–127 (6th Cir. 1989). A frequently utilized yardstick to determining if a debtor has the ability to repay his debts, is to ascertain whether, under a hypothetical Chapter 13 case, the debtor could repay a meaningful percentage of his or her debts. In re Behlke, 358 F.3d at 434–435. To make this determination, the primary consideration is the amount of the debtor's "disposable income" available to pay into a repayment plan. "Disposable income" is defined as that income received by a debtor which is not reasonably necessary to be expended for the maintenance and support of the debtor and his or her dependents. 11 U.S.C. § 1325(b)(2).

Looking at the Debtor's schedules in this case, which the Court has already found to be reasonable, the Debtor has available only $51.48 per month. Over a five year repayment plan, the amount that would be paid would be approximately $3,088.80. After subtracting attorney fees, which would be approximately $3,000.00, there would be little distribution to unsecured creditors, including the Bank. Including the Debtor's expected tax refunds does not significantly change this determination. Using these figures, it is clear to this Court that the Debtor could not repay a "meaningful percentage" of his debts in a Chapter 13 case. As such, the totality of the circumstances of the Debtor's financial situation does not demonstrate an abuse.

The final issue for the Court to consider is the Debtor's request for costs against the Bank. At the hearing the Debtor requested fees and costs for defending the Motion to Dismiss under § 707(6). The Court was unable to find a § 707(6) in the Bankruptcy Code, but the Debtor may have been referring to § 707(b)(5)(A) which does allow the Court to award a debtor all reasonable costs, including attorney fees, in contesting a motion to dismiss. In order to award costs, that subsection requires the Court to 1) not grant the motion to dismiss; and 2) find that the position on

the moving party violated Rule 9011 of the Federal Rules of Bankruptcy Procedure or that the attorney who filed the motion failed to perform a reasonable investigation and that the purpose of the motion was to coerce the debtor into waiving a right guaranteed to the debtor under Title 11.

The Court will deny this request for a number of reasons. First, if the Debtor wanted this relief he should have requested such in his responsive pleading or, at the latest, in his pre-trial brief. It would be inherently unfair to allow the Debtor to spring this request upon the Bank at the last minute without allowing the Bank some notice that such relief was being requested. Secondly, the Bank did not violate Rule 9011 by the filing of this motion. It is clear to the Court that the Bank conducted a thorough investigation of this matter prior to filing the motion. Finally, there is no evidence whatsoever that the purpose of the motion was to coerce the Debtor into waiving any right guaranteed to the debtor under Title 11. For all of these reasons, the Debtor's requests for costs will be denied.

To conclude, the Court does not find that the Debtor filed this case in bad faith. Moreover, the totality of the circumstances of the Debtor's financial situation does not demonstrate an abuse. As such, the Bank has failed to prove the elements of 11 U.S.C. § 707(b) which would mandate the dismissal of this case. With respect to the Debtor's request for costs, the Court will not award the Debtor costs. The Debtor failed to properly request such costs, and the Bank's position was well grounded, if not successful. An Order accompanying this Memorandum will be entered this same date.

Alan C. Stout
United States Bankruptcy Judge

Dated: March 13, 2012

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| In re: ) | |
| ) | |
| GREGORY W. SMITH ) | CASE NO. 11-34263 |
| ) | CHAPTER 7 |
| Debtor ) | |
| _____) | |

## ORDER

Pursuant to the Court's Memorandum entered this same date and incorporated herein by reference,

**IT IS ORDERED** that the Motion to Dismiss filed by Republic Bank & Trust is **Denied**.

**IT IS FURTHER ORDERED** that the Debtor's request for costs is **DENIED**.

Alan C. Stout
United States Bankruptcy Judge

Dated: March 13, 2012